UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANA L. MATHEWS, | ) | CASE NO.: 1:06CV3028 |
| | ) | |
| Petitioner, | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| KELLEH KONTEH, Warden, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Respondent. | ) | |

Pursuant to 28 U.S.C. § 2254, Petitioner Dana Mathews, a prisoner in custody at the Toledo Correctional Institution, is challenging his Richland County, Ohio Court of Common Pleas convictions for aggravated murder with a firearm specification, attempted murder with a firearm specification, felonious assault, possession of a firearm in a liquor premises, and possession of a weapon while under a disability.  ECF Dkt. #1.  On February 21, 2007, the case was referred to the undersigned for a report and recommendation.  ECF Dkt. #5.  For the following reasons, the undersigned recommends that the Court DISMISS the instant petition with prejudice:

## I.    SYNOPSIS OF THE FACTS

The Ohio Fifth District Court of Appeals set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999).  As set forth by the Fifth District Court of Appeals, the facts are:

> Appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification; one count of murder, in violation of R.C. 2903.02(A), with a firearm specification; one count of attempted murder, in violation of R.C. 2903.02(A) and 2923.02(A), with a firearm specification; one count of possession of a weapon while under disability, in violation of R.C. 2923.13(B); one count of possession of a firearm in a liquor permit premises, in violation of R.C. 2923.121; and one count of carrying a concealed weapon, in violation of R.C. 2923.12(A). These charges arose out of the shooting death of Antonio Andrews

[hereinafter Andrews] and the wounding of Terrence Harris [hereinafter Harris] in the parking lot of the American Legion Post in Mansfield, Ohio, on the night of December 2, 2003.

The matter proceeded to a jury trial. At trial, appellant admitted to shooting Andrews and Harris but maintained that he did so in self-defense after wrestling away a gun from Andrews.

A significant amount of evidence was presented at trial. Generally, the evidence produced was as follows.

On the evening of December 2, 2003, appellant was drinking in the American Legion Post's bar along with various other people, including Andrews (nicknamed "Tripper"), Harris (nicknamed "Teeter"), Marquis Lucas (nicknamed "Dummy" or "Kee"), Mario Young (nicknamed "Goldie" or "Mo"), and Anthony Bowen (nicknamed "T-Bone"). Appellant sat at a table with Lucas, Young and Bowen. Andrews and Harris sat at a separate table. Two women, Kemyia McGhee and Dorthea Burton, arrived at the bar. The mood in the bar changed at that point. Burton and appellant were having a relationship and appellant was purportedly Burtons' boyfriend.

Andrews started talking with Burton about renewing their past relationship but was rebuffed. Subsequently, Andrews announced to all in the room that he "loved" Burton. Andrews was thereupon teased and laughed at by the other patrons. Scuffles broke out between Harris and Lucas and then between Andrews and Young. According to Lucas, after Young and Andrews got into a scuffle, Andrews threatened to go get a gun and "blast all you." As a result of the scuffles, the bartender and the doorman decided to close the bar and ordered everyone to leave. One witness testified that Harris was angry and upset when he left the bar. That witness heard Harris say that "he'd be back." However, other witnesses testified that they did not hear any threats.

Appellant, McGhee, Burton, Lucas, Young and Bowen left together.[FN 1] All except Bowen got into Young's car. At that point, according to some witnesses, Andrews and Harris pulled up in another car, quickly cut them off, and jumped out of the car. In general, witnesses who were with appellant that night testified to the following events after Andrews and Harris jumped out of the car and approached Young's car. Andrews and Harris were yelling "what's up now," in an aggressive, threatening manner with their hands under their shirts as if they had something under their shirts. Tr. 352, 355, 358, 391, 394, 400. As Andrews and Harris approached them, the occupants of Young's car got out. One witness, McGhee, testified that she had "turned around" to talk to Burton when she heard a gunshot. When she turned around to look, McGhee saw appellant, with a gun, shooting at Andrews and Harris. McGhee did not see a physical altercation between appellant and Andrews. Further, McGhee did not see a gun on either Andrews or Harris.

> FN 1   There was conflicting evidence as to whether Andrew and Harris left the bar before or after appellant and his friends.

McGhee testified that Andrews ended up laying on the ground. McGhee claimed that appellant then approached Andrews while he was on the ground and shot him in the head while saying, "Fuck him." McGhee, Burton, Lucas and appellant then left the scene in Young's car.

Seneca McCoy saw appellant and Lucas shortly after the shooting. Seneca testified that they appeared calm, cool and collected and did not talk about the shooting. Eventually, appellant asked Seneca to get him a motel room in her name. Seneca

-2-

refused. However, eventually, appellant, Lucas, McGhee, Burton and Young spent the night at Seneca's apartment.

At trial, Harris (one of the victims) testified to a somewhat different version of events. Harris claimed that he did not hear that the bar was closed. However, Harris went outside and started his car. Soon thereafter, he was joined by Andrews. Harris claimed that appellant, Burton, McGhee, Lucas and Young then came out of the bar and Andrews got into an argument with appellant. When Harris saw the argument, Harris got out of his car and walked over to where they were standing. Harris testified that he saw appellant draw a gun. Harris claimed that he grabbed Andrews around the neck and started pulling him away. As they were walking away, he heard two shots and was shot in the back. Harris testified that he then heard three more shots.

Harris further claimed that, before he was shot, he saw Lucas holding a second gun, which he described as silver in appearance. Harris did not see who shot him nor did he see who shot Andrews, but claimed that at the time he was shot in the back, appellant was behind him, pointing a black gun. Harris stated that he did not see a struggle between Andrews and appellant for a gun and that Andrews did not have a gun with him that night.

A chrome-plated handgun was found at the scene of the shooting under a car next to which Harris was lying, within arm's reach. Harris denied having a weapon that night and when shown the gun found at the scene, denied ever having seen it before.[FN 2]

> FN 2   Gunshot residue had been found on Harris' right hand and sleeve of the jacket he was wearing that night, but he could not explain how it got there. The State presented evidence to attempt to explain the gunshot residue found on Harris. Officer Minard, one of the officers to arrive on the scene of the shooting, testified that he frequently handles his weapon with the same gloves he was wearing when he assisted Harris. Mike Tempe, a trace evidence examiner, testified that it was possible for the primer residue to transfer to the victim as a result of contact with a police officer.

The handgun found at the scene near where Harris was lying was found to be rusty, with dirt in the barrel of the gun. Four 9 millimeter (9mm) bullet casings and a .380 caliber bullet were found at the scene. A nine millimeter slug was recovered from Harris' body. All the 9mm casings had been fired from the same gun. According to a forensic examiner, neither the casings nor the bullets that were found at the scene could have been fired from the .380 caliber gun found at the scene.

Appellant testified on his own behalf. Appellant testified to the following. He admitted that he was a convicted felon, having been released on parole from an aggravated robbery conviction. Appellant also admitted that he had a prior drug possession conviction and had been a drug dealer. On the night of December 2, 2003, he went to the American Legion with Lucas and Young in Young's car. Harris and Andrews arrived at the bar later, as did Burton and McGhee. After Andrews, who was drunk, announced his love for Burton, Andrews and Young got into a scuffle, as did Lucas and Harris. Andrews made a comment to appellant about his girlfriend as he was pushed out of the bar by the doorman. Harris went with Andrews, saying "we'll be back." Appellant, Young, Lucas, Burton and McGhee then had another drink. After about ten or fifteen minutes, the doorman advised that it was time for all to leave and they complied. Appellant denied that he had brought a gun to the bar that night.

-3-

Appellant testified that as he, Lucas, Burton, McGhee, Young and Bowen were getting into Young's car, headlights came up quickly behind the car. This prompted appellant and the others to exit the car, thinking that they would have to fight Andrews and Harris. According to appellant, one of the women said "they got guns" and started running. Appellant then saw Harris with a gun, who walked right past him, apparently focusing on Lucas. According to appellant, he walked to the back of the car. Andrews ran up to him and pulled a gun out of his waistband. Appellant then grabbed Andrews' arm and the gun while Andrews grabbed appellant's arm. As appellant tried to break from Andrews' grasp, appellant "just started shooting." Appellant then looked around for Harris and saw him chasing Lucas with a gun as Lucas ran away. Harris saw appellant behind him. As Harris started to turn toward appellant with the gun, appellant shot Harris. Appellant denied walking up to Andrews and shooting him point-blank. According to appellant, they all then got back into Young's car and left.

Appellant testified that he shot Andrews and Harris because shootings amongst his peers were becoming more commonplace and he feared for both his life and that of Lucas. Appellant claimed that he feared that he would be facing one or more parole violations and that the police would not believe his claim of self-defense. Therefore, he fled to Cleveland.[FN 3]

> FN 3 Appellant was not found and arrested until January, 2004. Appellant testified that he had left the gun he had wrestled from Andrews in Young's car and that he did not know what happened to it. He testified that the gun found at the scene near Harris was the gun which Harris was pointing at Lucas and started to turn on him.

On cross-examination, over counsel's objection and a previously filed motion in limine, the trial court permitted the prosecution to question appellant about his alleged involvement in a shooting which had taken place in Mansfield, Ohio, on November 20, 2003.[FN 4] Appellant denied any involvement in that incident, despite the prosecutor's allegation that bullet casings found at the scene of the November shooting were determined to have been fired from the same weapon that fired the casings found at the American Legion Post on December 2, 2003.

> FN 4   At the time of trial, appellant had been indicted in connection with the earlier shooting but had not been tried or convicted for the same.

Testimony from additional witnesses showed the following. Harris sustained three gunshot wounds to his chest, back and right flank in the shooting, but survived. Andrews was found dead at the scene, lying on his back, having sustained gunshot wounds to the back of his head behind his left ear and to his left shoulder, with the bullet continuing into his chest. Due to the lack of powder burns or residue found on his scalp, the shot to Andrews' head was determined to have been fired from a distance of more than four feet away. The bullet went through Andrews' head, but no bullet or fragments were found at the scene near his body. Blood tests determined that both Harris and Andrews were intoxicated at the time of the shooting and that Harris had cocaine in his system.

When police arrived at the scene of the shootings, the vehicle from which Andrews and Harris had apparently exited was found to be running, with its headlights on and loud music playing. It was parked at an angle different than the other cars in the lot.

-4-

Police interviewed Harris at the hospital after the shooting. Harris said that he had seen appellant shoot Andrews, had heard three shots and had felt himself get shot twice. Contrary to everyone else's testimony, Harris stated that appellant had gotten into a scuffle with Andrews inside the bar. Harris stated that they did, however, hear "some subject" say that they were going to get a gun and that he and Andrews then left the bar. Harris said that once outside, appellant and Andrews were involved in a further argument and appellant pulled out a gun.

After the defense rested and over appellant's objection, the trial court permitted the prosecution to present rebuttal evidence concerning the November shooting. The defense requested a voir dire examination of the witnesses on the matter. That request was denied. Thereafter, the prosecution presented Mansfield Police Detective Ed Schmidt. Detective Schmidt testified that appellant had been developed as a suspect, along with Anthony Bowen, in the November, 2003, shooting based upon interviews with a Tabitha Carter ("Carter").

On cross-examination, Schmidt acknowledged that Carter had given previous statements indicating she could not identify the assailants in the November shooting. It was established through a crime lab technician that 9 millimeter casings had been found at the scene of the November shooting. Further testimony established that the 9 millimeter casings found at the West Fourth Street house in November were fired from the same gun that was used to shoot Andrews and Harris.

The prosecution then called Tabitha Carter as a rebuttal witness. Carter was a convicted felon who was serving time for drug possession and was an admitted crack cocaine addict. Carter testified that she was in the darkened kitchen of the West Fourth Street home on November 20, 2003, when a tall black man and a short, stocky black man entered the house. The two assailants started shooting. Two men who were in the kitchen with Carter that night were shot. Carter did no know appellant at that time and did not identify him as one of the assailants in her first statement to police. Some months later, Carter told police that she "heard on the street" that one of the assailants was appellant. Later, when both she and appellant were incarcerated in the Richland County Jail, Carter claimed that appellant "apologized" to her for her being in the house that night. Carter later claimed that it was by virtue of this conversation with appellant that she could identify appellant as one of the assailants in the November 2003, shooting.

Ultimately, the jury found appellant guilty of the aggravated murder of Andrews, with firearm specification; the attempted murder of Harris, with firearm specification; the felonious assault of Harris, with firearm specification; having a weapon while under disability; and possession of a firearm in a liquor permit premises. The lesser-included count of murder (of Andrews) was dismissed and appellant was found not guilty of the charge of carrying a concealed weapon.

The trial court sentenced appellant to consecutive prison terms of twenty years to life on the charge of aggravated murder; ten years on the charge of attempted murder; eight years on the charge of felonious assault; and one year each on the charges of having a weapon under disability and possessing a firearm in a liquor establishment. The trial court imposed consecutive six year prison terms for each of the three firearm specifications.[FN 5]

> FN 5  The parties agree that appellant was sentenced as stated. It is not clear that this assertion is correct. The Sentencing Entry states that "[f]or the FIREARM SPECIFICATIONS, the defendant shall serve an

> additional 6 years of mandatory and consecutive imprisonment pursuant to R.C. 2929.14(D)(1)," However, at the sentencing hearing, the trial court stated that appellant was sentenced to three three-year sentences for the "gun" specifications that must be served consecutively. Tr. 1932-1933. Thus, the total sentence for the firearm specification would total 9 years.

ECF Dkt. #7, Ex. 9.

## II.    PROCEDURAL HISTORY

### A.    State Trial Court

On June 10, 2004,[1] the Grand Jury for Richland County, Ohio issued an indictment alleging 7 charges against Petitioner: (Count 1) aggravated murder, in violation of Ohio Revised Code (O.R.C.) § 2903.01(A), with a firearm specification pursuant to O.R.C. § 2941.145; (Count 2) murder, in violation of O.R.C. § 2903.02(A), with a firearm specification pursuant to O.R.C. § 2941.145; (Count 3) attempted murder, in violation of O.R.C. § 2923.02(A), with a firearm specification pursuant to O.R.C. § 2941.145; (Count 4) felonious assault, in violation of O.R.C. § 2903.11(A)(2),  with a firearm specification pursuant to O.R.C. § 2941.145; (Count 5) having a weapon while under a disability, in violation of O.R.C. § 2923.13; (Count 6) possession of firearm in liquor permit premises, in violation of O.R.C. § 2923.121(A); and (Count 7) carrying a concealed weapon, in violation of O.R.C. § 2923.12(A).

On June 29, 2004, Petitioner, accompanied by counsel, entered a plea of not guilty to the charges.  ECF Dkt. #7, Ex. 2.

On August 2, 2004, prior to trial, Petitioner filed a motion in limine.  ECF Dkt. #7, Ex. 3. Petitioner's motion sought to exclude any evidence pertaining to criminal charges against him in another case for a shooting that allegedly occurred on November 20, 2003.  *Id.*

The case against Petitioner for the December 2, 2003 shooting proceeded to a trial before a jury.  *See* ECF Dkt. #7, Ex. 17 ("Tr.").  The Jury found Petitioner guilty of Counts 1, 3, and 4, all with firearm specifications.  ECF Dkt. #7, Ex. 4.  The jury also found Petitioner guilty of Counts 5 and 6.  *Id.*  The jury found Petitioner not guilty of Count 7.  *Id.*  The jury did not return a verdict

---

[1] Although the signature page of the indictment does not bear a date, a time stamp indicates it was filed on June 10, 2004.

-6-

with respect to Count 2 because the Count 2 was a lesser included offense with respect to Count 1. *Id.*; *see* Tr. Vol. X. at 1896.

On September 3, 2004, the trial court sentenced Petitioner to 20 years to life imprisonment for Count 1; 10 years of imprisonment for Count 3; 8 years of imprisonment for Count 4; 1 year of imprisonment for Count 5; and 1 year of imprisonment for Count 6.  ECF Dkt. #7, Ex. 5.  The trial judge ordered the sentences for Counts 3, 4, 5, and 6 to be served consecutively with each other and concurrently with the sentence for Count 1.  *Id.*

**B.      Direct Appeal**

On September 9, 2004, Petitioner, through counsel, filed a notice of appeal to the Ohio Court of Appeals for the Fifth District.  ECF Dkt. #7, Ex. 6.  On May 23, 2005, Petitioner filed an appellate brief setting forth the following assignments of error:

> I.    THE VERDICTS AND CONVICTIONS OF DEFENDANT-APPELLANT UPON THE CHARGES OF AGGRAVATED MURDER, ATTEMPTED MURDER AND FELONIOUS ASSAULT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED IN THE TRIAL COURT BELOW AS A MATTER OF LAW.
>
> II.   THE EVIDENCE PRESENTED IN THE TRIAL COURT BELOW WAS INSUFFICIENT AS A MATTER OF LAW TO ESTABLISH THE ELEMENT OF PRIOR CALCULATION AND DESIGN REQUIRED FOR A CONVICTION OF AGGRAVATED MURDER IN VIOLATION OF R.C. 2903.01(A).
>
> III.  THE TRIAL COURT COMMITTED REVERSIBLE AND PREJUDICIAL ERROR BY ADMITTING EVIDENCE OF UNPROVEN PRIOR CRIMINAL ACTS ALLEGED TO HAVE BEEN COMMITTED BY DEFENDANT-APPELLANT WHEN THE PRIOR ACTS AND ALLEGATIONS WERE THEMSELVES NOT SUPPORTED BY ANY CREDIBLE PROBATIVE EVIDENCE.
>
> IV.   THE TRIAL COURT COMMITTED PLAIN AND PREJUDICIAL ERROR BY FAILING TO GIVE THE JURY A LIMITING INSTRUCTION REGARDING THE ADMISSION INTO EVIDENCE OF PRIOR UNPROVEN CRIMINAL ALLEGATIONS AGAINST DEFENDANT-APPELLANT, PURSUANT TO RULE 404(B) OF THE OHIO RULES OF EVIDENCE.
>
> V.    THE VERDICT AND CONVICTION OF DEFENDANT-APPELLANT UPON THE CHARGE OF POSSESSING A WEAPON WITHIN A LIQUOR PERMIT PREMISES WAS INCONSISTENT WITH THE JURY'S VERDICT OF ACQUITTAL UPON THE CHARGE OF CARRYING A CONCEALED WEAPON AND IS THEREFORE UNSUPPORTED BY SUFFICIENT EVIDENCE AS A MATTER OF LAW.

VI.     THE TRIAL COURT COMMITTED PLAIN AND PREJUDICIAL ERROR BY INSTRUCTING THE JURY THAT BELIEF IN THE TESTIMONY OF THE STATE'S WITNESSES REQUIRED A VERDICT OF GUILTY.

ECF Dkt. #7, Ex. 7 at iii.

On February 8, 2006, the Ohio Court of Appeals affirmed Petitioner's conviction.  ECF Dkt. #7, Ex. 9.

**C.      Supreme Court of Ohio**

On March 16, 2006, Petitioner filed a *pro se* notice of appeal to the Supreme Court of Ohio. ECF Dkt. #7, Ex. 10.   Petitioner also filed a memorandum in support raising the following propositions of law:

I.      Does an erroneous misdescription of the burden of proof and credibility jury instruction together violate a defendants [sic] Due Process rights?

II.     Must a defendant be sufficiently identified as the perpetrator of other acts wrongs or crimes in order for the State to introduce evidence of other acts, wrongs or crimes

III.    The verdict was against the manifest weight of the evidence

IV.     There is an Insufficiency [sic] of the evidence to sustain the verdict

ECF Dkt. #7, Ex. 11.

On June 7, 2006, the Supreme Court of Ohio denied leave to appeal in an unexplained decision.  ECF Dkt. #7, Ex. 13.

**D.      Rule 26(B) Motion**

On May 3, 2006, Petitioner filed a *pro se* application to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).  ECF Dkt. #7, Ex.14.  Petitioner raised the following assignments of error:

I.      WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THE ASSIGNMENT OF ERRORS FROM A FEDERAL CONSTITUTIONAL PERSPECTIVE, THUS BARRING FEDERAL REVIEW BECAUSE OF A PROCEDURAL BAR.

II.     WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING INSUFFICIENTCY [sic] OF THE EVIDENCE TO THE CHARGES OF ATTEMPT MURDER AND FELIOUS [sic] ASSAULT.

ECF Dkt. #7, Ex. 14.

On June 19, 2006, the Ohio Court of Appeals denied the motion because Petitioner failed to provide a sworn affidavit setting forth a factual basis for alleging that appellate counsel's representation was deficient.  ECF Dkt. #7, Ex. 16.

### E.      Federal Habeas Corpus Petition

On December 4, 2006, Petitioner filed the instant petition.  ECF Dkt. #1; *see Towns v. U.S.*, 190 F.3d 468, 469 (6th Cir. 1999) citing *Houston v. Lack*, 487 U.S. 266, 270-74 (1988) (a *pro se* prisoner's petition is considered to be filed on the day he delivers it to prison authorities).  Petitioner raised the following grounds for relief:

| | |
|---|---|
| GROUND ONE: | PETITIONER  WAS  DENIED THE CONSTITUTIONAL RIGHT TO DUE PROCESS. 14 AMENDMENT |
| Supporting FACTS: | THE  TRIAL  COURT  VIOLATED PETITIONERS [sic] CONSTITUTIONAL RIGHTS BY INSTRUCTING THE JURY THAT BELIEF OF THE TESTIMONY OF THE STATES [sic] WITNESSES REQUIRED A VERDICT OF GUILTY. (Tr., pp. 1889). 14 AMENDMENT |
| GROUND TWO: | PITITIONER [sic] WAS DENIED THE CONSTITUTIONAL RIGHT TO DUE PROCESS. 14TH AMENDMENT |
| Supporting FACTS: | PETITIONER   WAS NEVER CONSTITUTIONALLY IDENTIFIED AS THE PERPETRATOR OF OTHER ACTS EVIDENCE,  BEFOR  [sic]  THE  EVIDENCE  WAS INTRODUCED INTO TRIAL. |

ECF Dkt. #1.

## III.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a writ of federal habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

The Supreme Court has held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly

-9-

meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

### A.  Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not an issue in this case.  *See* ECF Dkt. #1, 3, 7 at 12-14.  Respondent contends, however, that Petitioner's claims are barred as a result of procedural default.  ECF Dkt. #7 at 14-27.

### B.  Exhaustion of State Remedies

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated.  *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims.  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law.  *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003);

-10-

*see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.) cert. denied, 509 U.S. 907 (1993)(quotation omitted).

Unless an exception applies, the Court must dismiss a petition for lack of exhaustion if it contains at least one issue that was not presented to the state courts so long as a remedy is still available for the petitioner to pursue in the state courts. *Rose v. Lundy*, 455 U.S. 509, 518-20 (1982). The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist." *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds*, *Fay v. Noia*, 372 U.S. 391 (1963). A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

### C.    Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

-11-

(1)     whether the petitioner failed to comply with an applicable state procedural rule;

(2)     whether the state courts actually enforced the state procedural sanction;

(3)     whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004). A state's *res*

-12-

*judicata* rule barring post-conviction claims which could have been raised on appeal is an adequate and independent ground for *Maupin* purposes. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). The above standards apply to the Court's review of Petitioner's claims.

## IV.    STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 4, 2006, well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

-13-

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

    (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

B. Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C. The state court decision may be overturned only if:

-14-

1.    It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

2.    the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

3.    'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

4.    the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.    Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.    Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

-15-

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## V.      ANALYSIS

Based upon the applicable standards of review, the undersigned recommends that the Court dismiss the instant petition, with prejudice, for the following reasons:

### A.      Ground One is procedurally barred.

For convenience, Ground One of the instant petition is repeated here:

GROUND ONE:         PETITIONER  WAS  DENIED THE CONSTITUTIONAL RIGHT TO DUE PROCESS. 14 AMENDMENT

Supporting FACTS:   THE  TRIAL  COURT  VIOLATED PETITIONERS [sic] CONSTITUTIONAL  RIGHTS  BY  INSTRUCTING  THE JURY  THAT  BELIEF  OF  THE  TESTIMONY  OF  THE STATES [sic] WITNESSES REQUIRED A VERDICT OF GUILTY. (Tr., pp. 1889). 14 AMENDMENT

ECF Dkt. #7 at 6.

Respondent acknowledges that Petitioner raised the same argument in Assignment of Error Six in his direct appeal and in Proposition of Law One in his appeal to the Supreme Court of Ohio.  ECF Dkt. #7 at 17.  Respondent contends, however, that Petitioner raised the argument in state courts as a purported error in application of state evidentiary law, not as a due process claim.  *Id.*  Respondent further contends that Petitioner's claim is procedurally defaulted because the Ohio Court of Appeals found that Petitioner failed to object to the jury instruction at trial as Ohio procedural rules require.  *Id.*

-16-

In order to determine if Ground One of the instant petition is procedurally defaulted,  the Court must apply the four-part *Maupin* test.  The Court must first determine if Petitioner failed to comply with a state procedural rule.  Here, Ohio has a rule of law, known as the contemporaneous objection rule, which requires a defendant to object to an improper jury instruction before the case is submitted to the jury.  Ohio Rule of Criminal Procedure 30(A) provides:

> On appeal, **a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict**, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Ohio Crim. R. 30(A); *See also State v. Underwood*, 444 N.E.2d 1332, 1333 (Ohio 1983); *State v. Williams*, 364 N.E.2d 1364 (Ohio 1977); *State v. Humphries*, 364 N.E.2d 1354 (Ohio 1977).

Here, Petitioner failed to object to the allegedly improper jury instruction, and consequently failed to comply with Ohio's contemporaneous objection rule.  The Ohio Fifth District Court of Appeals stated that Petitioner's trial counsel failed to object to the jury instructions at trial.  ECF Dkt. #7, Ex. 9 at 24.  Petitioner does not challenge that finding.  *See* ECF Dkt. #1, 3, 10.  Since Petitioner does not challenge the state appellate court's finding, the undersigned finds that Petitioner has failed to satisfy the burden imposed by 28 U.S.C. § 2254(e)(1) that is required to rebut a finding of fact made by the state court of appeals.  Consequently, the undersigned finds that trial counsel failed to object to the jury instruction before the case was submitted to the jury.  Therefore, the first prong of the *Maupin* test is satisfied.

The second prong of the *Maupin* test is also satisfied because the Ohio appellate courts enforced the procedural bar.  Petitioner contends that the Ohio Court of Appeals did not specifically state that the objection requirement was the basis for dismissing the claim.  ECF Dkt. #10 at 6.  Petitioner further contends that the Ohio Court of Appeals "conducted the sort of review of the jury instruction that presumably would have been undertaken had there been a timely objection to it, and reached the merits of petitioner's claim, thus waiveing [sic] any default."  *Id*.  This assertion is misplaced because the appellate court stated that trial counsel failed to object, and then the court went on to apply a plain error test.  ECF Dkt. #7, Ex. 9 at 24.  The Sixth Circuit has held that a state

-17-

appellate court's review under plain error analysis is not equivalent to a review on the merits. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). Consequently, "a state court's plain error analysis does not save a petitioner from procedural default." *Id*. citing *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir.2000). Therefore, the second prong of the *Maupin* test is satisfied.

Turning attention to the third prong of the *Maupin* test, the Sixth Circuit has held that Ohio's contemporaneous objection is an adequate and independent ground to foreclose federal review. *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 955 (2007); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000). Therefore, the third prong of the *Maupin* test is satisfied.

Under the fourth prong of the *Maupin* test, Petitioner does not allege cause for failing to comply with the state procedural rule. *See* ECF Dkt. #3 at 14-16, 10. If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527, 533 (1986). Therefore, the fourth prong of the *Maupin* test is satisfied.

For the foregoing reasons, the undersigned recommends that the Court find that Ground One of the instant petition is procedurally barred and, therefore, should be dismissed with prejudice.

### B.     Ground Two lacks merit.

For convenience, Ground Two is repeated here:

GROUND TWO:      PITITIONER [sic] WAS DENIED THE CONSTITUTIONAL RIGHT TO DUE PROCESS. 14TH AMENDMENT

Supporting FACTS:   PETITIONER   WAS NEVER CONSTITUTIONALLY IDENTIFIED AS THE PERPETRATOR OF OTHER ACTS EVIDENCE, BEFOR [sic] THE EVIDENCE WAS INTRODUCED INTO TRIAL.

ECF Dkt. #1.

Respondent contends that Ground Two is procedurally barred because Petitioner never fairly presented his federal claim to the Ohio Court of Appeals. ECF Dkt. #7 at 18- 27. Respondent reasons that the only federal case he relied upon in his brief on direct appeal is inapplicable. *Id.*

-18-

Respondent's argument rest upon the applicability of *Neil v. Biggers*, 409 U.S. 188 (1972), to Petitioner's case.  Respondent contends that *Biggers* does not apply to Petitioner's case, and since *Biggers* was the only federal case Petitioner cited in the Ohio Court of Appeals, he failed to properly raise a cognizable federal claim in the state court.  The undersigned will forego procedural default analysis in favor of dismissing the case on the merits because Respondent's argument requires an analysis of the merits of Petitioner's claim and because the undersigned ultimately finds that the claim lacks of merit.  *See Granberry*, 481 U.S. at 135; *Prather*, 822 F.2d at  1421-22.

### (i)        Scope of Ground Two.

The first question is whether Petitioner's claim is based on an alleged misapplication of federal law as it applies to in-court identifications (*see Biggers*, 409 U.S. 188), or whether his claim is based on an egregious state evidentiary ruling.  *See Walker v. Engle*, 703 F.2d 959 (6th Cir. 1983).

Petitioner's second ground for relief only generically refers to a violation of due process.  ECF Dkt. #1 at 7.  Therefore, the Court should look to the supporting facts to determine the scope of the claim.  The supporting facts that Petitioner lists for Ground Two show that his claim is not aimed at an egregious state evidentiary ruling, but at the alleged misapplication of federal law pertaining to in-court identifications:

> PETITIONER WAS NEVER **CONSTITUTIONALLY IDENTIFIED** AS THE PERPETRATOR OF OTHER ACTS EVIDENCE, BEFOR [sic] THE EVIDENCE WAS INTRODUCED INTO TRIAL.

ECF Dkt. #1 at 7 (emphasis added).  Further, in his traverse, Petitioner stated "the state court's decision resulted in a decision that was contrary to, and involved an unreasonable application of *Biggers*, a clearly established federal case."

It is of note that Petitioner alleges an egregious evidentiary ruling in his traverse.  ECF Dkt. #10 at 12.  Generally, a traverse is an improper document in which to raise new issues that were not raised in a petitioner's original petition for federal habeas relief because it does not notify the State of the claim or allow the State an opportunity to oppose it.  *Taylor v. Mitchell*, 296 F.Supp.2d 784, 798 (N.D. Ohio 2003), citing *Cacoperdo v. Demonstenes*, 37 F.3d 504, 507 (9th Cir. 1994) and *Jack*

-19-

*v. Randall*, No. C-2-99-947, 2000 WL 1456992 at *7 (S.D. Ohio June 20, 2000).  Therefore, in determining the scope of Ground Two, the undersigned will not consider the allegation in Petitioner's traverse.

Having determined that Ground Two is limited to the alleged misapplication of federal law pertaining to in-court identifications, the undersigned will proceed to conduct a brief review of the *Biggers* case.

### (ii)    Synopsis of *Neil v. Biggers*.

In *Biggers*, police subjected a victim of a rape crime to an inappropriately suggestive showup by walking her past a person at the jail who was in custody and ordering him to repeat the words that her rapist used, "shut up or I'll kill you."  *Biggers*, 409 U.S. 193-95.  The victim identified the man as her assailant.  *Id.* at 195.  Following his conviction, the assailant filed a petition for a writ of habeas corpus, for which the United States Supreme Court eventually granted certiorari.  *Id.* at 189.

The Court first outlined its prior holdings related to the constitutionality of in-court identifications following suggestive out-of-court identifications.  *Biggers*, 409 U.S. at 196-98.  The Court stated the standard for determining whether due process requires the exclusion of an in-court identification following a suggestive out-of-court identification:

> (W)e hold that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 196-97 quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968).  "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."  *Id.* at 198.

At issue in *Biggers* was whether the Due Process Clause requires an unnecessarily suggestive identification procedure alone (*i.e.*, independent of factors indicating a likelihood of reliable identification) to be excluded at trial.  *Biggers*, 409 U.S. 198-99.  The Court held that  an

-20-

unnecessarily suggestive identification procedure alone does not require exclusion of an in-court identification. *Id*. at 199. Rather, the trial court must consider the totality of the circumstances to determine if the in-court identification was reliable despite an early suggestive identification. *Id*. The trial court must consider the following factors for determining the likelihood of misidentification at a confrontation: include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id*. at 199-200.

The *Biggers* Court held that the rape victim's in-court identification following a suggestive showup was constitutional because:

> The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had 'no doubt' that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant.

*Biggers*, 409 U.S. at 200-201.

### (iii) *Biggers* does not apply to the instant case.

In the case at bar, the trial court allowed Tabitha Carter to testify as a rebuttal witness regarding the November, 2003 shooting that involved the same gun fired that the casings recovered from the scene of the December, 2003 shooting. Tr. Vol. IX. at 1728. The court reasoned that Carter's testimony implicating Petitioner in that shooting could help establish Petitioner's motive and his possession of the weapon used in the December, 2003 shooting. *Id*. Furthermore, the trial court found that Tabitha Carter's testimony was probative toward Petitioner's credibility. *Id*.

Petitioner contends that the trial court violated his right to due process by allowing Tabitha Carter to testify and to identify him as one of the perpetrators in a November, 2003 shooting. ECF

-21-

Dkt. #3 at 16-20.  Petitioner contends that a constitutional error arose under *Biggers* because Tabitha Carter's testimony indicating Petitioner's involvement in the November, 2003 shooting lacked indicia of reliability.  ECF Dkt. #10 at 10.

Petitioner contends that Tabitha Carter's testimony did not satisfy the totality of the circumstances test set forth in *Biggers*.  *Id.*  As Respondent contends, however, *Biggers* is not relevant to Petitioner's case because the *Biggers* Court dealt only with suggestive confrontations conducted by government actors in the course of criminal investigations such as lineups and showups – confrontations where police presented the defendant to the victim for the purpose of identification.  Absent an allegation of a suggestive confrontation, *Biggers* does not apply.  Petitioner does not argue that a government actor facilitated a suggestive confrontation between Carter and Petitioner for the purposes identification.  *See* ECF Dkt. #1,3,10.

Petitioner states in his traverse:

Since Carter never saw the shooters during the crime or saw whoever she was talking to in the alleged "confession", then testified she did see the shooters during the crime, *which amounts to a suggestive identification*, *Biggers* can and must be applied in the present case.

*        *        *

Since Carter failed to view anyone's face during the shooting or conversation it was impossible for Carter to link petitioner to the gun used, thus the trial court abused it's [sic] discretion in allowing the other acts evidence into trial *which exposed petitioner to a suggestive identification*, which could have been avoided if trial judge had allowed an in camera hearing outside of the jury's presence and heard Carter's testimony as requested by trial counsel.

ECF Dkt. #10 at 11 (emphasis added).  It appears that Petitioner is alleging that Tabitha Carter's in-court identification was suggestive to the jury.  As previously discussed, the *Biggers* Court dealt with out-of-court identifications that are suggestive to the victim of the crime.  Tabitha Carter's in-court identification was just that – an identification.  Petitioner appears to argue that Tabitha Carter's testimony suggested his identity to the jury; however, identifying the perpetrator is precisely the purpose of almost every in-court identification.  The constitutional violation arises under *Biggers* when the in-court identification has been tainted by an out-of court confrontation that improperly

suggests the suspected perpetrator to the victim.  Therefore, although Petitioner uses the phrase "suggestive identification" he does not allege the type of suggestive confrontation with which the *Biggers* Court was concerned.

Furthermore, neither trial counsel nor appellate counsel advanced an allegation of a suggestive confrontation.  *See* ECF Dkt. #7, Ex. 3; Tr. Vol. IX. at 1723-32; ECF Dkt. #7, Ex. #7 at 23-27.

Lastly, Tabitha Carter's testimony fails to establish that a suggestive confrontation occurred.  At trial, Tabitha Carter testified that *Petitioner* brought up the subject of the November, 2003 shooting during their conversation in prison.  Tr. Vol. IX. at 1788, 1802.  She further testified that it was common for prisoners to discuss past crimes with other prisoners.  Tr. Vol. IX. at 1805.  Carter then testified that *she* approached Detective Schmidt with Petitioner's confession.  Tr. Vol. IX. at 1806.  Therefore, Tabitha Carter's testimony gives no indication that a suggestive confrontation occurred.

Since the instant petition lacks an allegation of a suggestive confrontation, and Tabitha Carter's testimony does not establish that a suggestive confrontation occurred, the undersigned finds that Ground Two lacks merit and should be dismissed with prejudice.

## VI.    CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition with prejudice.


Date: March 18, 2008                              ___*/s/George J. Limbert*_____
                                                  GEORGE J. LIMBERT
                                                  UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

-23-